## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | 1:10MJ89-1 (M.D.N.C.) |
| | ) | 3:10CR170-9 (E.D. Va.) |
| | ) | |
| HAROLD HERNDON, a/k/a Lil' Dave | ) | |

## MEMORANDUM OPINION AND ORDER

This case came before the Court on June 21, 2010, for a hearing on a Motion for Detention by the United States, pursuant to 18 U.S.C. § 3142(f)(1)(A) and (E).  After receiving evidence and hearing argument, the undersigned United States Magistrate Judge announced in open court that the defendant, Harold Herndon, a/k/a Lil' Dave, would be detained pending disposition of the charges against him, pursuant to 18 U.S.C. § 3142(e)(1), because clear and convincing evidence established that no condition or combination of conditions of release would reasonably assure the safety of other persons and the community.  The Court now enters this written order memorializing that ruling as required by 18 U.S.C. § 3142(i)(1).

### BACKGROUND

A federal grand jury for the Eastern District of Virginia indicted the defendant (along with 26 others) for participating in a RICO (Racketeer Influenced Corrupt Organizations) Conspiracy, in violation of 18 U.S.C. § 1962(d), and for participating in a VICAR (Violent Crime in Aid of Racketeering) Conspiracy, in violation of

18 U.S.C. § 1959(a)(6).[1]  As to the RICO Conspiracy, the indictment alleges that the underlying pattern of racketeering activity included acts indictable under 18 U.S.C. §§ 1512(b)(3) (witness tampering), 1951(a) (extortion), and 1955 (operating an illegal gambling business), and 26 U.S.C. §§ 841(a)(1) (drug distribution) and 856(a)(2) (maintaining drug-involved premises), as well as acts involving murder, arson, kidnapping, robbery, and extortion as proscribed by state law.  The indictment identified the racketeering activity underlying the VICAR Conspiracy as including acts involving murder, robbery, extortion, and drug trafficking in violation of federal and/or state law.

The indictment identifies the time period of the RICO Conspiracy as from in or about 2005 to June 10, 2010, and the time period of the VICAR Conspiracy as from in or about March 2006 to June 10, 2010.  Both charges revolve around the activities of the American Outlaw Association ("the Outlaws"), a group identified as a highly-organized, criminal motorcycle gang.  The indictment charges that the defendant is a member of the Outlaws (specifically of the chapter based in Lexington, North Carolina) and the vice president of the group's Copper Region, which encompasses the seven chapters located in Virginia, North Carolina, and South Carolina.

According to the indictment, the Outlaws seek to control the geographic territory near gang chapters to collect more member dues and pursue this agenda by conspiring to commit acts of violence

---

[1] The indictment also contains additional counts charging various substantive offenses, but none of those counts name the defendant.

-2-

against other gangs (including, most prominently, the Hell's Angels Motorcycle Club ("the Hell's Angels")), as well as people or groups affiliated with such rivals. This alleged conspiracy included possession of firearms in connection with crimes of violence and provision of firearms to Outlaws' members prohibited from such possession (including by maintaining firearms in member-accessible areas of chapter clubhouses). Allegations in the indictment also describe how the Outlaws engaged in drug distribution, extortion, and illegal gambling to benefit the enterprise and its members. The indictment further alleges that the conspiracy involved obstruction of justice, including through the provision of false information designed to impede the investigation and prosecution of members and by intimidating or retaliating against witnesses who cooperated with the criminal justice system. Finally, the Outlaws allegedly conspired to reward members who carried out racketeering activities and to punish members who did not.

Prior to the detention hearing, a United States Probation Officer assigned to the Pretrial Services Unit prepared a report regarding the defendant's history, residence, and family ties, his employment history and financial resources, his health (including as to mental health and substance abuse issues), and his prior record. Both parties had an opportunity to review that report before the hearing. At the hearing, the defendant stipulated to the accuracy of the factual information in the report.

In addition, at the inception of the hearing, the Court advised the parties that it intended to consider the affidavit of

-3-

a federal law enforcement agent submitted in support of a search warrant application for the defendant's residence (Case No. 1:10MJ80 (M.D.N.C.)) and then took a recess to allow the parties as much time as they wished to review said affidavit. Once the parties gave notice that they were ready to proceed, the Court received credible testimony from the federal law enforcement agent who submitted the above-referenced affidavit (and served as the case agent for the investigation underlying the indictment). Said agent testified, among other things, about the reports he received regarding the execution, on June 15, 2010, of search warrants at the defendant's residence and the Outlaws' clubhouse in Lexington. Finally, the Court heard testimony from Kimberly Vizzini, who identified herself as the defendant's fiancé.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on the foregoing record, the Court makes the following findings of fact and conclusions of law regarding the factors identified in 18 U.S.C. § 3142(g):

1) The offenses charged against the defendant constitute crimes of violence, involve controlled substances, and involve firearms (irrespective of the absence of allegations in the indictment that he personally committed acts of violence or acts involving controlled substances or firearms). See United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) (ruling that defendant indicted for RICO Conspiracy involving racketeering activity that included crime of violence, such as extortion, was charged with "crime of violence" under Bail Reform Act of 1984, notwithstanding

-4-

fact that indictment did not allege defendant personally committed any such violent act), cited with approval in United States v. Ayala, 601 F.3d 256, 267 (4th Cir. 2010) (holding that RICO Conspiracy predicated on "pattern of violent racketeering activities, including murder, kidnapping, and robbery" constituted "crime of violence" under 18 U.S.C. § 924(c)).

Because of their statutorily-mandated importance, see 18 U.S.C. § 3142(g)(1) (identifying issue of "whether the offense is a crime of violence . . . or involves a controlled substance [or] firearm" as required part of assessment of "nature and circumstances of the offense charged"), these facts weigh heavily against release. See United States v. Stone, ___ F.3d ___, ___, 2010 WL 2499658, at *4 (6th Cir. 2010) ("In terms of dangerousness, Congress also thought it was especially significant if the charges include 'a crime of violence, . . . a Federal crime of terrorism, . . . or involve[] a . . . firearm, explosive, or destructive device.'" (brackets and ellipses in original)); United States v, Coleman, No. 5:01CR77, 2001 WL 1249682, at *4 n.2 (N.D.N.Y. July 24, 2001) (unpublished) ("Congress has made it clear that the nature of the crime as one of violence is an important consideration, particularly on the issue of dangerousness.").

2) The offenses charged against the defendant are, as a categorical matter, serious in nature and indicative of danger to the safety of other persons and the community. See Ayala, 601 F.3d at 266 ("[T]he VICAR statute addresses the particular danger posed by those . . . who are willing to commit violent crimes in order to

bolster their positions within [racketeering] enterprises.");
United States v. Boidi, 568 F.3d 24, 32 (1st Cir. 2009) (noting
that "RICO, of course, is a serious crime"); United States v.
Gambino, 818 F. Supp. 541, 547 (E.D.N.Y. 1993) (holding that RICO
Conspiracy offense is "serious in that [it] is punishable by
imprisonment for twenty years").

The specific racketeering activities underlying the conspiracy
charges are, as a categorical matter, serious in nature and
indicative of a risk of danger. See United States v. Caro, 597
F.3d 608, 624 (4th Cir. 2010) ("[I]llegal drugs have long and
justifiably been associated with violence."); United States v.
Williams, 576 F.3d 1149, 1158 (10th Cir. 2009) ("Being a felon in
possession of a firearm is a serious offense."); United States v.
White, 571 F.3d 365, 373 (4th Cir. 2009) (holding that conspiracy
to commit robbery with dangerous weapons, even absent any charged
overt act, constitutes "a dangerous type of crime that creates a
serious potential risk of physical injury to another" (internal
brackets and quotation marks omitted)); United States v. Mir, 525
F.3d 351, 355 (4th Cir. 2008) (characterizing witness tampering as
"serious offense"); Barapind v. Enomoto, 360 F.3d 1061, 1065 (9th
Cir. 2004) (describing "conspiracy to commit murder" as "serious"
crime); United States v. Brandon, 247 F.3d 186, 191 (4th Cir. 2001)
(quoting with approval Ninth Circuit's statement that "the danger
of violence inheres in the combination of firearms and drugs").

As a result, "the nature and circumstances of the offense[s]
charged," 18 U.S.C. § 3142(g)(1), "certainly weighs in favor of

detaining [the defendant] pending trial," <u>United States v. Cisneros</u>, 328 F.3d 610, 618 (10th Cir. 2003) (endorsing decision that "RICO conspiracy . . . involving predicate acts of murder, conspiracy to murder, and the manufacture and possession with intent to distribute drugs" was "very serious" and that the first factor under 18 U.S.C. § 3142(g) therefore supported detention).

3) The evidence before the Court (from the case agent's affidavit and testimony) reflects, consistent with the allegations in the indictment, that the defendant is (and, at various times during the course of the investigation, has been) a leader within the Outlaws' Copper Region. Although the mere fact of an individual's association with (and even leadership of) a violent enterprise does not per se warrant detention, <u>see</u> <u>Ciccone</u>, 312 F.3d at 543; <u>United States v. Patriarca</u>, 948 F.2d 789, 795 (1st Cir. 1991), such association does bear on the risk of danger inquiry, <u>see</u> <u>United States v. Tortora</u>, 922 F.2d 880, 885 & n.6 (1st Cir. 1990). In particular, "[e]vidence of [a] defendant['s] leadership role is relevant in evaluating the nature of the charges . . . and the seriousness of the danger that his release would pose . . . ." <u>United States v. Shea</u>, 749 F. Supp. 1162, 1169 (D. Mass. 1990).

4) Evidence from the case agent's affidavit and testimony as to the method of operation of the Outlaws illustrates the particular relevance of the defendant's leadership position in assessing the nature and circumstances of the offense (as it pertains to the risk of danger) in this case; specifically:

-7-

The national president of the Outlaws and the membership-elected regional presidents make decisions regarding matters such as ordering acts of violence against rival gangs. These binding directives are conveyed through regional leaders back to chapter leaders and then to rank-and-file members. This method of operation tends to confirm that the defendant was fully aware of the violent objectives of the Outlaws. His knowing participation as an enterprise leader under such circumstances strongly indicates that his release would endanger other persons and the community.

Further, the Outlaws reward members who carry out the enterprise's objectives and punish members who do not. In addition, the Outlaws popularly elect the enterprise's leaders. Given these facts, it would be unreasonable to believe that the defendant could become a leader of the Outlaws without affirmatively supporting violent conduct.

Finally, because of his leadership position, the defendant could more easily overcome the restraining effects of release conditions to achieve the Outlaws' objectives, such as obstruction of justice, as well as to continue to promote violence against rival gangs, by directing the actions of others. See United States v. Colombo, 777 F.2d 96, 100 (2d Cir. 1985) ("[T]hese conditions may serve as inconveniences, but they do not hinder [the defendant's] alleged ability to supervise an illegal enterprise."). The fact that the case agent's affidavit documents the Outlaws' commitment to retaliate against persons who cooperate with the criminal justice system and that this case involved multiple

-8-

undercover law enforcement agents and confidential informants heightens the "nature and seriousness of the danger to [other] persons [and] the community that would be posed by the [defendant's] release," 18 U.S.C. § 3142(g)(4).

5) The case agent's affidavit and testimony establish that, during the time period of the indictment, the Outlaws (including members from chapters in the Copper Region) have engaged and attempted to engage in acts of violence against rival gangs. In addition, the case agent testified that, on June 15, 2010, during the execution of arrest and search warrants related to this indictment, at least one of the indicted Outlaws instigated a shoot-out. A law enforcement officer was struck by a round (though he fortunately was protected by body armor) and one of the indicted Outlaws was shot dead. These facts demonstrate that the risk of danger in this case, including obstruction of justice by violence, is demonstrably greater and more serious than the risk of danger that arises, by operation of predictive inference alone, in a conspiracy of this sort. In other words, the fact that the Outlaws have actually (and recently) carried out the very kind of violence one might anticipate when individuals enter into this type of conspiracy makes "the nature and circumstances of the offense[s] charged," 18 U.S.C. § 3142(g)(1), more grave than a truly inchoate crime and more strongly indicative of the need to detain the defendant because of the "nature and seriousness of the danger," 18 U.S.C. § 3142(g)(4), his release would pose.

-9-

6) The case agent's affidavit and testimony show that, during the time period of the indictment and up to the time of his arrest, the defendant was actively participating in the Outlaws' enterprise, including traveling to out-of-state meetings and engaging in the gang's illegal activities (specifically, promotion of illegal gambling and unlawful possession of firearms). These facts, relevant to "the nature and circumstances of the offense[s] charged," 18 U.S.C. § 3142(g)(1), and "the nature and seriousness of the danger to any person and the community that would be posed by the [defendant's] release," 18 U.S.C. § 3142(g)(4), bolster the view that the defendant is directly and substantially involved in the Outlaws' enterprise and thus more likely, if released, to continue its dangerous illegal activities.

7) Based on the case agent's affidavit and testimony, the Court finds that the instant indictment arose from a lengthy investigation carried out with the assistance of uniquely-placed undercover law enforcement agents; specifically:

In 2008, as part of a national investigation into the Mongols Motorcycle Club ("the Mongols"), two undercover agents working with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("the ATF") became Mongols in the Virginia/Maryland area. Late in 2008, federal charges were brought against the Mongols, but such charges were primarily targeted at the Mongols' membership in the western United States. This scenario created two phenomena that enabled the ATF to achieve a high-level penetration of the Outlaws. First, the two undercover agents operating as Mongols in the Virginia/

-10-

Maryland area were not compromised, but could remain in their established undercover roles. Second, the Outlaws apparently saw the disarray caused to the Mongols by the federal prosecution as an opportunity to further the Outlaws' ongoing effort to build the enterprise's membership base in Virginia (where, as recently as 2006, the gang had not held any territory). These two phenomena came together when an Outlaws' chapter in Virginia began recruiting Mongols, including the two undercover agents, to switch their affiliation from the Mongols to the Outlaws.

The two undercover agents used this opportunity to secure a meeting with Outlaws' leaders, including the national president and the then-Copper Region president. As a result of that meeting, the Outlaws agreed to allow the two undercover agents to establish a new Outlaws' chapter in Virginia (and to recruit members). This development allowed the ATF to embed another undercover agent and two confidential informants among the Outlaws. By mid-2009, this newly-established Outlaws' chapter gained full status with undercover agents and confidential informants as chapter leaders.

The ATF thereafter had direct access to meetings held and information shared between the highest levels of the Outlaws' leadership. This penetration, the most significant ever achieved by law enforcement into one of the four largest criminal motorcycle gangs, allowed the United States to gather direct evidence about the workings of the Outlaws' enterprise, the identity and roles of its leaders, and the criminal activities and plans of the enterprise. The undercover agents traveled to Outlaws' clubhouses

-11-

throughout the Copper Region, including Lexington, and interacted extensively with members and leaders of the Outlaws in the region.

Through this access, the undercover agents personally witnessed conspiratorial and racketeering activity by the Outlaws' enterprise. They received solicitations from members of the Outlaws to commit perjury and to lie to a defense attorney about an assault committed by an Outlaw. They heard Outlaws' members discuss the creation of a false alibi in connection with a planned shooting. They participated in a confrontation instigated by members of the Outlaws as part of a plan to assault members of the Hell's Angels. They observed an Outlaws' member carry out an assault against a member of a smaller motorcycle gang. They received directions from the then-Copper Region president to murder Hell's Angels' members. They were present on multiple occasions when leaders of the Outlaws instructed members to seek out, to assault, and to rob members of the Hell's Angels. They heard members of the Outlaws discussing specific planned assaults, some involving firearms and explosives. They received an order from the Outlaws' national president to shoot members of the Hell's Angels. They observed drug use and distribution by Outlaws' members. They witnessed Outlaws' members possessing firearms and providing firearms to prohibited persons. They saw members of the Outlaws possessing a firearm in the Lexington clubhouse.

Finally, the undercover agents verified the defendant's role as a regional leader of the Outlaws and observed him at leadership (and member-wide) meetings. They also directly discussed with the

defendant his prior federal conviction for racketeering activity. During this discussion, the defendant stated that he had fled to avoid those charges and would do so again if he ever faced similar charges in the future. The defendant also informed the undercover agents about the thousands of dollars in profits the Lexington Chapter made from illegal gambling each month. The undercover agents thereafter worked directly with the defendant to secure the transportation of gambling machines from North Carolina to Virginia for use by the Outlaws' enterprise.

These facts support a finding that "the weight of the evidence against [the defendant]," 18 U.S.C. § 3142(g)(2), is very strong, particularly as to the character of the Outlaws as an enterprise whose members conspired to engage in racketeering activity as alleged in the indictment, as to the leadership structure and method of operation of the Outlaws, and as to the defendant's knowing participation in and leadership of an enterprise that he recognized as criminal in nature.

8) Recent events described by the case agent during his testimony at the detention hearing corroborate the foregoing evidence and further elevate the quantum of evidence against the defendant for purposes of 18 U.S.C. § 3142(g)(2) and the nature and seriousness of the danger posed by the defendant's release pursuant to 18 U.S.C. § 3142(g)(4); specifically:

Law enforcement officers conducted surveillance of the defendant and other targets of the investigation during the days prior to the execution of the arrest and search warrants arising

-13-

from and related to the instant indictment. During that time, the defendant was observed at an Outlaws' gathering in Ohio. On June 15, 2010, law enforcement officers executed a search warrant at the defendant's residence in Lexington. The defendant was present, along with his minor child, his mother, and Ms. Vizinni. On a shelf in a nightstand beside the bed in the defendant's bedroom, officers found a loaded pistol with a round chambered.[2] Elsewhere in the residence, they also recovered two baggies of apparent powder cocaine (consistent with user quantities) in the pocket of an Outlaws' t-shirt, as well as two pen caps with apparent cocaine residue (suggesting their use as devices for snorting cocaine). That same day, law enforcement officers executed a search warrant at the Outlaws' Lexington clubhouse. During the search, they seized a loaded firearm stored with an extra loaded magazine behind the bar in an area accessible to all members.

9) The defendant's criminal history reflects prior federal convictions for conspiracy to commit racketeering activity and for distribution of methamphetamine. The defendant served a prison sentence of 48 months and, under the terms of his original sentence, still would have been under supervised release conditions at this time. However, the defendant received the benefit of early termination of his supervised release term after only one year. The evidence before the Court suggests that the defendant took the

---

[2] The recovery of firearms from a defendant's residence constitutes an established ground for finding that the defendant poses a danger to the safety of the community. See United States v. Portes, 786 F.2d 758, 765 (7th Cir. 1985); United States v. Cox, 635 F. Supp. 1047, 1055 & n.11 (D. Kan. 1986).

-14-

wrong message from that favorable disposition and promptly resumed his involvement in the instant racketeering activity.[3]

These facts, which concern the defendant's "character, . . . past conduct, . . . [and] criminal history," 18 U.S.C. § 3142(g)(3)(A), matters bearing upon "the history and characteristics of the [defendant]," 18 U.S.C. § 3142(g)(3), raise concerns regarding the safety of others and the community posed by the defendant's release and highlight a substantial risk that conditions short of detention would not deter the defendant from resuming the dangerous criminal activity of the sort in which the evidence strongly shows he has been participating.

10) The Court finds that the defendant has provided and caused the provision of false information to the Pretrial Services Unit and the Court in an effort to secure release. Such action (which reflects on the defendant's "character," a consideration identified by statute as relevant to the Court's assessment of "the history and characteristics of the [defendant]," 18 U.S.C. § 3142(g)(3)(A)) indicates a willingness by the defendant to obstruct the criminal

---

[3] This fact undercuts any inference favorable to the defendant from the fact that, "at the time of the current arrest," he was not "on probation, on parole, or on other release," 18 U.S.C. § 3142(g)(3)(B). During the six-year period between his release from federal custody and his instant arrest, the defendant has been arrested for multiple charges of assault with a deadly weapon with intent to kill and inflicting serious injury, communicating threats, assault and battery, and assault on a female. The defendant has received no convictions as a result of the foregoing charges and therefore the Court draws no inference that he committed the charged acts. The Court nonetheless observes that the circumstances of the dismissal of several of the charges is identified as "requested by prosecuting witness." This disposition is not inconsistent with the record evidence that the Outlaws' method of operation includes intimidation of witnesses for the purpose of obstructing the prosecution of members.

justice process. This fact strongly weighs against the defendant's release because it undermines any basis the Court might have for concluding that he would obey conditions and heightens the concern that he will resume criminal activity, particularly given that the instant racketeering charges include allegations regarding obstruction of justice and that the evidence before the Court confirms that the Outlaws have obstructed justice.

First, the Pretrial Services Report states that the defendant "report[ed] that he was a member of the Outlaw Organization for many years; however, he retired his association in January 2010. According to Kimberly Vizzini, the defendant made this decision in order to be a fulltime father to his disabled child." The evidence before the Court establishes that, in January and February 2010, the defendant was actively involved in the Outlaws' racketeering conspiracy in that, during this period, the defendant arranged for the delivery of gambling machines from North Carolina to Virginia. Further, only days before his arrest on these charges, the defendant was observed attending an Outlaws' gathering in Ohio. Moreover, during her testimony at the detention hearing, Ms. Vizzini admitted that the defendant is a member of the Outlaws and that he attended an Outlaws' gathering outside of North Carolina shortly before his arrest. She made no claim that the defendant disassociated himself from the Outlaws in January 2010.

Second, the Pretrial Services Report states that "[t]he defendant reports that he has a history of marijuana use; however, until January 2010, he had not used marijuana in many years. He

denies use of alcohol and other drugs. . . . According to [the defendant's sister] and Ms. Vizzini, the defendant is drug free." The evidence before the Court reflects that, on the date of his arrest, law enforcement officers seized from the defendant's residence user quantities of cocaine in the pocket of an Outlaws' t-shirt and two cocaine snorting devices. The Court finds that, contrary to the representations to the Pretrial Services Unit by and on behalf of the defendant, the defendant has used drugs other than marijuana and the defendant is not drug free.[4]

Finally, at the detention hearing, the defendant called Ms. Vizzini as a witness for the primary purpose of testifying about the firearm recovered from the nightstand in the defendant's bedroom. Ms. Vizzini averred that the firearm was hers, that the defendant had no knowledge of its presence in the residence, and that she never brought it in the residence when the defendant was present. According to Ms. Vizzini, on this occasion, she brought the firearm into the residence after the defendant left on the morning of June 11, 2010, for protection in the defendant's absence. Ms. Vizzini gave no explanation for her failure to remove the firearm from the residence upon the defendant's return on the "evening" or the "afternoon" (depending upon which of Ms. Vizzini's answers one chooses to credit) of June 14, 2010.

---

[4] This fact also bears negatively on another statutorily-identified consideration, the defendant's "history relating to drug or alcohol abuse," 18 U.S.C. § 3142(g)(3)(A). A defendant who is abusing drugs and lying to the Pretrial Services Unit about that abuse is not a good candidate for release, particularly where, as here, drug use and distribution form part of the charges and the defendant has a prior federal conviction for drug distribution.

-17-

After hearing Ms. Vizzini's testimony and observing her demeanor on the stand, the Court does not find her testimony credible.  Ms. Vizzini failed to answer direct questions.  She gave evasive and argumentative responses.  Ms. Vizzini contradicted herself, as well as established facts.  For example, Ms. Vizzini testified that the defendant had no knowledge of the firearm and that she "never" chambered a round in the firearm; however, the case agent previously testified that, according to the officers who seized the firearm, it had a round chambered when seized.[5]  When confronted with questions intended to raise an inference that, given the condition of the firearm when seized and her testimony that she "never" chambered a round, the defendant knew about the firearm (because he must have chambered the round), Ms. Vizzini sarcastically suggested that, if a round was chambered, the only person who could have done so was the defendant's allegedly disabled, three-year-old child.

The Court rejects Ms. Vizzini's attempted exculpation of the defendant as lacking any credibility.  The defendant gave no indication of surprise from Ms. Vizzini's testimony on this point; nor did the defendant make any effort to distance himself from it. Under these circumstances, a strong inference arises that the

---

[5] The seizing officers and the case agent had no reason to anticipate Ms. Vizzini's testimony about the condition of the firearm.  Nor does the Court have any reason to believe that the seizing officers or the case agent falsified information about the firearm's condition.  Notably, as to the firearm seized from the Outlaws' Lexington clubhouse, the officers reported (according to the case agent's testimony) that no round was chambered.  If the officers and/or the case agent had wished to falsely exaggerate the situation, there is no apparent reason they would have done so as to one seized firearm and not the other.

-18-

defendant shares accountability for what amounts to an attempt to interfere with the proper administration of justice in this case.

11) The remaining considerations related to the defendant's "history and characteristics" listed in 18 U.S.C. § 3142(g)(3)(A) shed little, if any, light on the risk of danger analysis. The defendant has several complaints about his health, including most prominently that he relies on a prosthetic leg due to an amputation resulting from a motorcycle accident. Although he apparently receives disability benefits, nothing about the defendant's health appears to have inhibited his involvement with the Outlaws. For example, just days before his arrest, the defendant traveled to Ohio to participate in an Outlaws' meeting. Moreover, as noted above, because of his leadership role, the defendant can promote the Outlaws' unlawful objectives by directing others. Similarly, the Court concludes that, although the defendant has apparent family ties and long-time residency in the Lexington area, that consideration would bear only on the risk of flight determination. No basis exists for the Court to infer that the defendant's family ties or residency history suddenly would dissuade him from engaging in criminal activity and thereby endangering others and the community, given that these matters have had no such effect in the past. Finally, nothing remarkable appears regarding the defendant's "financial resources," 18 U.S.C. § 3142(g)(3)(A), the defendant has not identified any "community ties," id., and, even if he had, that consideration, like his "record concerning

appearance at court proceedings," id., would bear only on the issue of risk of flight, not danger.[6]

In sum, the Court concludes that all of the statutorily-mandated factors, i.e., the nature and circumstances of the charged offenses, the weight of the evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger that the defendant's release would pose, weigh heavily in favor of detention. Indeed, the record establishes by clear and convincing evidence that no condition or combination of conditions (including placement on home confinement with his sister and/or Ms. Vizzini as third-party custodian(s))[7]

---

[6] In making his case for release, the defendant's counsel focused on the defendant's relationship with his allegedly disabled, minor child, as well as on difficulties the defendant allegedly has encountered in managing his prosthetic leg while in custody. Despite several invitations from the Court, defense counsel could not explain how those considerations factored into the legal standard set out in the Bail Reform Act. The Court finds that these considerations, even if credited, do not alter the analysis of the risk of danger required by 18 U.S.C. § 3142. Further, on the present record, no basis exists to credit the defendant's claims. As to his minor child, the only evidence that the defendant alone can serve as a suitable care-giver comes from Ms. Vizzini. The Court found Ms. Vizzini's testimony on this subject no more convincing than that which she offered regarding the firearm seized from the defendant's bedroom. Any hardship suffered by the defendant's child as a result of the defendant's confinement pending trial is unfortunate, but the defendant has provided the Court with neither a reliable basis for assessing the facts surrounding that matter, nor any legal authority that would indicate such a consideration could trump the danger analysis under 18 U.S.C. § 3142.

[7] Near the end of the hearing, in announcing its decision in favor of detention, the Court mistakenly referenced the possibility of the defendant's mother, rather than his sister, serving as a third-party custodian. The defendant's counsel advised the Court of this mistake at the time and the Court confirmed that this distinction did not alter the determination. Nothing in the record appears that would cause the Court to conclude that the defendant's sister could control the defendant's conduct. As discussed above, the defendant's sister vouched to the Pretrial Services Unit that the defendant was "drug free," whereas the evidence reflects that, at the time of his arrest, the defendant
(continued...)

would reasonably assure the safety of others and the community. The Court's conclusion in this regard stems primarily from a determination that, if released, the defendant would not refrain from engaging in dangerous criminal activity with and on behalf of the Outlaws.

**IT IS THEREFORE ORDERED** that the Motion for Detention by the United States is GRANTED and the defendant shall be detained pending disposition of the instant charges pursuant to 18 U.S.C. § 3142(e)(1). The defendant is committed to the custody of the Attorney General of the United States or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant shall be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver the defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**

June 25, 2010

---

[7](...continued)
possessed cocaine for personal use. These circumstances tend to undercut the notion that the defendant's sister would prove effective as a monitor, let alone a check, on the defendant's criminal behavior. For reasons previously stated, the Court also lacks confidence in Ms. Vizzini's suitability as a third-party custodian. In addition, the Court notes that Ms. Vizzini testified that, for part of each week, she lives and works outside the Middle District of North Carolina. This fact further undermines her fitness for the proposed role.